Good morning, Your Honors. May it please the court, Christopher A. Ferraro for appellant. I have reserved five minutes for rebuttal. Done. Mr. Ferraro, you just raised a chump. Can you tell me what's the right way to pronounce your client's name? Redding.  Yes. She's here today at the council table. Okay. Please proceed. Your Honor, this case began with a single Facebook post by Mrs. Redding on a matter of public concern. That being the exposure of elementary school children to age-inappropriate material on so-called gender identities. And everything that followed from that fully protected Facebook post was the result of a public furor the defendants themselves created. Okay. We're well familiar with the facts, so let's jump into the questions. That's fine. Okay. Now we have to deal with our subject matter jurisdiction first, right? And the standing for Mrs. Redding to bring a preliminary injunction claim. I don't hear anybody asserting that there's no subject matter jurisdiction for compensatory relief. But focusing on the preliminary injunction, because that's the only thing on appeal at this point, right? That's right. Okay. Just to be clear on the same page, I understand the requirements to establish standing to bring a claim like that are you have to have actual or imminent injury. You have to have that injury be fairly traceable to the defendant's actions. And it's got to be injury that's redressable by the court with a favorable ruling for your client. So my first question to you is, is there any difference at all between that imminent injury requirement to establish standing and the irreparable injury requirement for a preliminary injunction? I think the irreparable injury requirement and the imminent injury requirement converge in terms of the analysis. Because what we have here is an ongoing chill in addition to the obvious censorship. Stick with me. Does converge mean the same thing? Are they the same thing? I'd say functionally they are because the imminent injury is happening now. All right. So when the district court said there's no irreparable injury, the judge, she could just as well have said there's no standing, right? And in fact, she seems to say in a footnote she thinks there's no standing. But she wouldn't address it as a standing issue. Should she have? Is that all by itself? Is that error or is that a matter of concern for us? I think to the extent that she seems to be suggesting there's a lack of standing, that would be an error because there's obvious standing on two fronts. First of all, the obvious censorship under coercion and the substantial likelihood of recurrence, if we take the defendants at their word that they did this for reasons of public safety and they also consider it government speech, and then the retaliatory actions. Go with the district court's assertion that nothing has happened in nearly two years, that your client has spoken out and spoken out indeed on controversial matters, including things going on in the schools, and about this issue, about the fallout from this issue, and nobody has done anything to stop her. So the assertion of a chill shouldn't be taken at face value? And any censorship going on now is entirely self-imposed? Well, it isn't self-imposed. And the reason, especially in view of the Hardy speaker standard, is clear from the record, the uncontested record below. Any person of ordinary firmness would be deterred from speaking again on the same subject matter if that person was, first of all, having her speech censored under coercion by a local police chief at the behest of military officials, was referred to various security and law enforcement. You've made a case that may be very strong on it for compensatory relief, but I'm trying to get you to answer their assertion, which is two years have passed almost, and they've done nothing. So it's not true that a person of ordinary firmness would be deterred, and indeed, your client is not deterred. She continues to speak out and speak out publicly. They haven't done nothing. What they've done is they've set up a condition in which she was driven from Facebook, her most cherished forum. That was when Chief Duff coerced Stauffer to deplatform her, correct? That's right. But that was a couple years ago. And because of what they've done subsequently, which she has discovered through public records requests, it's obvious that she has been targeted as a domestic terrorist effectively, and so she has retreated from Facebook. But isn't the deplatforming from Facebook more accurately viewed as an ongoing harm rather than some sort of new action by Duff or any of the other defendants? I mean, it was one act in time caused your client harm, and the harm is ongoing because she's still deplatformed from that Stauffer's Facebook group. Right. But that's different than – I think it's a little strange to suggest that by Duff doing that act a couple of years ago, that Duff is continuing to do something. It's just the ongoing effect of what Duff did. Well, the continuing adverse effects resulting in the chilling of this particular speaker under the party speaker rule is, in fact, ongoing harm. And the existence of a continuing chill by way of retaliatory acts and censorship warrants injunctive relief. Well, for purpose of my question, I'm granting you that it's ongoing harm. But I'm asking, how does ongoing harm equate to the wrongdoer doing something over and over again when they only did it once? The effect is ongoing. Yes. The harm is ongoing, but the action – the act that you have sued upon as civilly actionable happened once, to Judge Jordan's point, a couple of years ago. That act happened once. The censorship of that – Right. So tell us what acts – what have they done in the last month or three months or 12 months? What have they done? Well, if you look at the Backpage case as an example of what I'm talking about – I'm asking you a factual question. What have they done – these defendants – what have they done in the last three, six, or 12 months? That I don't know. But I can tell you that what they have already done in terms of censoring her, reporting her to the New Jersey State Police Regional Operations Center – We can get all that for sake of discussion. Okay. The only question we're trying to wrestle with – look, this is a pretty narrow appeal. And I trust your client understands that and the other side understands it, too. We're not here on the merits. Whether she – whether what they did to her is actionable and whether she'll recover compensatory damages and whether there will be some kind of holding to account for the things that happened – That's not in front of us right now. And nothing that we're asking you and nothing that we're trying to figure out is meant to imply anything about whether we think those claims have merit or they don't. We're only trying to ask, are you entitled to prospective relief based on something that happened a couple of years ago? And that's why you're getting the questions you're getting. Because the assertion that there's ongoing harm, that seems to go to the point of someday I'll be entitled to damages for this. Not to, I'm entitled to a preliminary injunction to stop them from doing something when we're trying to figure out what is it you want them to stop doing. Because they say they haven't done anything for two years and you're not telling us any different. Well, first of all, the chill is irreparable harm and it's redressable in the following way. First of all, she has every right today to repost that Facebook post without interference from these defendants. Has she tried? No, because she's afraid to do so. Well, that's the whole – That's the whole – they succeeded. That's the whole censorship. That's what Murthy seems to be speaking to. Doesn't Murthy say, you know, it's not enough for you to say I won't do it because I'm worried. You've got to show more than that. You've got to show there's something that would indicate that if you did do it, they would do something to you. Well, we already know, for example, that when she's at the airport now, she's lost her trusted traveler status because they have designated her essentially as a form of domestic terrorism. And that's an ongoing harm that's redressable by an injunction. So, for example, the injunction – Who designated her as a domestic terrorist? Well, the anti-terrorism program manager of the military base referred her to law enforcement agencies involved in anti-terrorist activity. The New Jersey State – That sounds like a new action against the people that designated her. No, it's what this defendant did, Defendant Vasquez. He said, first of all – He designated her? Excuse me? He designated her? He's got the authority to remove her from trusted traveler status? What happened here is obviously a result of their activities in reporting her to the New Jersey Office of Homeland Security and Preparedness, the New Jersey State Police Anti-Terrorism Department, the Burlington County Prosecutor's Office Anti-Terrorism Coordinator. They've done their job. There's no need for them to do anything further. She is effectively chilled. And if you take them at their word when they say they acted for public safety and that they have the right to do what they did as government speech, why wouldn't they do it again if she tried to post again? When you say she's effectively chilled, please answer their assertion that she has posted and continues to post on controversial subjects, so she's not chilled. It's not accurate to say she's – This court has indicated, and other courts have indicated repeatedly, that the continued exercise of First Amendment rights at some level does not defeat a chill claim. For example, in Mirabella, the plaintiffs were given a no-contact order, but they appeared at a board meeting again. And this court held that that did not defeat their chill claim. In Backpage, the plaintiff continued to – What is it that she hasn't said that she wanted to say? When you say at some level, it feels like what – the argument you're making is what happened to her was really bad, and it doesn't matter how much time passes. It's always going to be really bad. She will always feel a sense of concern and anxiety if she speaks out. And that is enough. Have I understood you right? Like, we could be here five years from now, and if they'd still done nothing, your argument, would it be the same? That's the nature of a chill claim. It goes on forever. We could be here 20 years from now, and your argument would be the same. If they'd done nothing. But we're not here 20 years from now. We're here as soon as possible in the appellate process to get relief, and the relief here is available. It's traceable. The offense is traceable to these defendants. I understand we're here now, but I am trying to understand the limit of your argument. Your argument appears to be, a couple of years ago, some really bad stuff happened to this lady, and it's affected her willingness to speak up on matters that are very important to her and to a lot of other people. And that's enough because she feels anxiety about it, and the passage of time does not matter. Have I understood your argument? It doesn't matter in and of itself. That's correct. And that's the same in every chill case. In every chill case, someone comes to an appellate court years after the event happens, makes a chill claim, and in the cases I've cited, is successful. So, for example, in Backpage, the Seventh Circuit directed the entry of an injunction against Sheriff Dart. There was no problem with the fact that there had been a time lapse between what Sheriff Dart had done and the appellate court's grant of relief. If it were otherwise, then you could never get relief in a chill claim because the defense would always be able to say. You say never. Doesn't Murthy kind of go to that? Doesn't it say that these things are intertwined? I mean, it helps you, but the court says, if a plaintiff demonstrates that a particular government defendant was behind her past social media restriction, it will be easier for her to prove that she faces a continued risk of future restriction that is likely to be traceable to the same defendant. Conversely, if a plaintiff cannot trace her past injury to one defense, it will be harder. In other words, traceability and imminence of injury and repetition of injury, those things are tightly intertwined, and so if we can show what these defendants did really hurt her, then you may find it easier to believe that it would happen again. But they don't say that's enough by itself. In fact, they seem to say self-censorship will not warrant it. I mean, that's not good enough. You've got to show that people are ready to do something again. So in that context, doesn't the passage of time have to mean something? If you've got an extended period of time and nothing happens, is it really the case that that's irrelevant? As I said, in every CHILC claim, nothing has happened by the time the victim of the CHILC gets to court. There's an intervening process, a district court process, and an appellate process. So the argument that the mere passage of time between the wrongs committed and the resulting CHILC and appellate review negates the CHILC claim would defeat every CHILC claim. So what she's saying here is, and it's not that far removed from what happened, is that I am reasonably chilled. I haven't self-censored myself for no reason. I've self-censored myself because they came down on me, like the proverbial ton of bricks reporting me to numerous law enforcement and security agencies, under the idea expressed by defendant Schilling. We have to keep the pressure on her until her dangerous and divisive actions, meaning her speech, cease. And they succeeded in that. And so she's here to say, yes, time has gone by, but this wrong is redressable. An injunction could be issued stating... We got your argument. Okay. Do you need to say anything else to wrap up? I know I've exceeded my time, so I'd like to save the five minutes. All right, we'll have you back on rebuttal. Thank you, Your Honor. Okay, we'll hear from, I think, counsel for the federal defendants first. Thank you, Your Honor. It may please the court. My name is Graham White from the Department of Justice, and I represent the federal defendants. The district court committed no abuse of discretion in determining that a preliminary injunction was not necessary to safeguard the plaintiff's First Amendment rights as this case proceeds in the normal course. Is it an abuse of discretion to render a decision in the absence of jurisdiction? No, I don't think so. I mean, I understand that the... If there's no power to do anything, then how can you exercise discretion? Sorry, I think what I meant in response to your question is that, to the extent Your Honor is referencing whether the plaintiff has standing to seek an injunction here, the district court, in a footnote, noted that there was likely not standing for the same reasons that there was not irreparable harm. So I ask you the same question. Was that error? I mean, are we even allowed to entertain the merits of this in a significant way? Should the district court have said, look, I don't think there's standing, and I can't go further? It was not reversible error because plaintiff is not entitled to a preliminary injunction for the same reason, that there's no ongoing injury. The fact that there's no ongoing injury means that there's no irreparable harm sufficient to warrant a preliminary injunction. Is the United States positioned that immediate injury for standing purposes and irreparable injury for preliminary injunction purposes are functionally the same? Because it appears your colleague across the aisle there has said they are the same. Are you agreeing with that? Well, typically, courts have said that an irreparable injury for a preliminary injunction requires more of a heightened showing. But when you're talking about a future injury, so when you're talking about the need to show some sort of ongoing concrete and imminent injury, that is a heightened showing in and of itself. So it is a strong showing for both, for both for irreparable injury and for standing. Do I understand you to be saying – these aren't gotcha questions. I'm really interested in the party's positions on this. Do I understand you to be saying irreparable injury is even higher than immediate injury? So if you accept that the district court didn't abuse discretion in saying there's irreparable injury, you have to say there was no standing because there's certainly not an immediate injury. Is that what you're saying? So I think irreparable – the showing for an irreparable injury to establish a preliminary injunction is probably higher than the showing to establish standing. But regardless of which standard you're applying, the plaintiff can't make that on the record below. And that's why the district court did not abuse its discretion. So I want to start, I think Judge Hardiman had asked a question about whether there's sort of an ongoing injury here based on plaintiff's purported self-censorship from her decision to withdraw from the Facebook group. And I just have two principal responses to that. The first is that the injury is self-inflicted, as Justice Barrett explained in Murphy. When I was asking counsel about the injury, we were talking about Duff coercing Stouffer to deplatform her on Facebook. That wasn't her doing. She didn't want to be deplatformed. And Stouffer's testimony was pretty clear that Stouffer felt coerced. She deplatformed her while Duff was on the phone with her, as I recall. Isn't that right? So I was referring to the plaintiff's decision to withdraw from the Facebook group and whether that constitutes an ongoing injury. And my point there was simply that that's a self-inflicted injury and that there are also traceability. Well, I don't know if it's totally self-inflicted. If she's deplatformed, if her post was taken down against her will, her withdrawing from the group is her fault? I mean, why wouldn't she withdraw from the group if she's not allowed to speak freely on the group? Because I think what Justice Barrett made clear in Murphy and what the Supreme Court has also established in Clapper is that a plaintiff can't manufacture an injury based on a hypothetical future harm that's not likely to occur. Really, is the government's position that her concern is manufactured? When the record, at least as it comes to us at this point, is that a major in the U.S. Army labeled the post as extreme and far right, that he reported it to higher-ups at the Joint Base, that they got directly in touch with the superintendent of the school and with the superintendent's boss, that they reported it to the security, the terrorism officer at Fort Dix, and said, we're worried about the safety of our children. There was an invocation of school shootings in Valdez. There was a spinning up of local law enforcement, an urging of local law enforcement to directly get the Facebook folks to take this down. This didn't happen in a vacuum. This was the federal defendants, it looks like, essentially saying, this woman's nuts and she's going to get our kids killed. That's what it looks like. So is it really a fair thing to say, oh, this is just self-inflicted. She's just crazy. So a couple of responses to that, Judge Jordan. First, the first point I was going to make is that it's entirely speculative that if she were to rejoin this Facebook group and make similar posts about this, that the federal defendants or any of the defendants in this case would take any action against her. Is that entirely speculative? If you've had the whole world come down on you, is it just like a, is it fanciful to think that once you've been, you know, the assertion, I think, and I'm curious to know, I should ask this of Mr. Farr, there's a place in the appendix where somebody is corresponding by text with Chief Duff and says, it's baffling to me that anybody like this, like this person, this horrible person, could hold a position on the school board. To have the temerity to suggest that a poster about transgender rights and polysexualism and be who you are might just not be appropriate, age appropriate for elementary school. It's baffling that they could be on the school board. Is that the kind of opprobrium that just would leave a person of ordinary fortitude feeling like, yeah, I can express myself on these things, or might it actually result in a chill? So I see my time has expired. I'm dying to hear an answer. Okay, so I think a couple of responses here. First, it's speculative that any of the defendants would take any action in response to any additional posts going forward, because the concern of the federal defendants in this case has, from the outset of this controversy, been on the security of the school, not on the plaintiff or her speech. In what cases did they have to be worried about the security of the school? Other than Major Schilling, who clearly went from zero to 60 on this. Maybe I'm reading the record wrong, but it looks like Major Schilling said, I'm afraid this person is going to get people killed, because she said, I don't think this is age appropriate. Maybe I'm leaving something out. You want to fill in the gaps for us here? Sure. So the Joint Base has a unique relationship with this particular school, because the children— I get all that. I know their kids go there. I understand that. What I'm trying to understand is— Maybe we could ask it a different way. Maybe Judge Jordan will—I'm sorry to jump in, but what in the world does a parent, expressing whether these subjects are age appropriate for elementary school, what in the world does that have to do with a shooting at a nightclub in Colorado? Well, I think it's just important to take into account the context in which the posts were made. So this happened literally days after a shooting in Colorado. But let's talk about the posts. I couldn't find it in your brief. I'm sorry? Did you even tell us in your brief what the posts said? I can't find it. Sure. Your statement of the issue talks about a Facebook post, and it doesn't even quote it. So page three of our brief cites to the post. It's on page 125 of the appendix. It includes a screenshot of the post. And the Facebook post, in addition to having a photo of the elementary school that identifies the school, also referenced the name of the school in question. And part of what gave rise to the concern— Wait. Hold on a minute. You're going a little quick for me. You said page three, right? Where did you quote her post on page three? There's a photograph of the poster. Along with the citation to page 125 of the appendix where the post is. So this post was so offensive, and you don't even tell us what it is? You have us dig through the record to look at? The concern here— What exactly was the post that was so scary and offensive that invoked the precious resources of our United States military? So the concern has always been about the response by third parties. I didn't ask you about the concern. I said what was the post. So the post was— Quote what—I'd like you to tell us in open court what was so—what language, what was the post, and what was the language that was so scary to invoke the ire and the concern of our United States military and all the other law enforcement that ran to the scene? So the post indicated the identity of the elementary school in question. And in response to the post— What did the post say? The post talked about— I'm just asking you to quote the post that set all this in motion. The post was saying that schools were improperly educating kids about the specific terms that were on— You can't quote it? It said— Please just quote the post. I don't have the language of the post in front of me, but what I'm saying is— Right, but here we are. All of these things have happened. All of these controversies have happened about this post, and you can't even tell us what it is. No, the controversy is about the response to the post, because in response— Right, right, right. But we can't consider the response without the context of what provoked the response. I'll give you a piece of it, okay? I'll help you out here, Mr. White. This is midway down. Kids should respect differences. Kids should show kindness to all. Kids should respect and understand there are various family structures. However, kids should not be forced to learn about and accept concepts of sexuality in elementary school. So that's sort of the tenor of the post. That's what's going to get people shot up like they're in a nightclub in Colorado. So in response, the concerns that the federal defendants forwarded to their counterparts and state and local law enforcement is that there were responses to that post where third parties commented about breaking into the school and removing the posters by force. There were other publications that—I mean, this post went viral. And so, again, it's the response by third parties not— It's baffling to some of the defendants, baffling to them, that anybody holding that view could hold a seat on the school board. No, I don't think—I can't speak to what Major Schilling was saying in his personal capacity. But all I can say is that the federal defendants, in their official capacity, were concerned about the potential that third parties, not the plaintiff, could potentially be inspired to act violently. And there's evidence in the record to support that. Well, when you say the record supports that, I guess one would have to say the record supports that if one accepts that any invocation of safety is justified. That something that some third party said on some third party website is enough to point the finger at this plaintiff and say, her speech is dangerous, her speech is extreme, her speech is far right, she should be removed from the Facebook post, the post needs to be taken down. Anything somebody out there says justifies those things. That can't be the free speech doctrine. That puts the heckler's veto front and center. Any time anyone says anything on the Internet that's innocuous or thoughtful or critical in a polite academic way that then has somebody else show up and say crazy things, we're going to deprive the original poster of their free speech rights? That can't be how the First Amendment works. And that's not what we're arguing. May I respond, Judge Warden? I see the mic. Please. You're on our time. You know, this is a case that rightly has generated some attention because it looks like a lot of official people with power, real power, went out and said, in effect, this person is dangerous, shut her down. So that's the argument that's being made to us and that, in fact, it worked. She was shut down, and she still feels the anxiety associated with speaking up because she's been made a pariah by people like Major Schilling who think it's baffling that anybody who holds those views should express them. So I understand that that is the argument that PINEAPP is making. That is not what the evidence shows in this case, and that is not what the district court found. If I could elaborate. Give you an opportunity to tell us that that's wrong because there's a 300-page appendix, and I've spent some time in it, and when you say that's not what it shows, there's some pretty good stuff in there for the plaintiff. So just to take a couple of examples, the federal defendants did not refer the plaintiff to state law enforcement as the plaintiff will address here. They wanted to raise the concern to their partners in state and local law enforcement about the possibility of violence by others. Your Honor, I can quote you from Lieutenant Colonel Megan Hall's email to Defendant Payne saying, we want this post taken down. We want this post, her post, taken down. It didn't say third-party websites. It said we want her post taken down. So what do you mean they didn't go after her? That looks like going after her, doesn't it? The email does not say that the federal defendants asked for the post to be taken down. I want that to be very clear. There's no evidence in the record that the federal defendants asked for this post to be removed. Well, what she said was the parents want it taken down. Okay. So what do you think it means when the Lieutenant Colonel liaison from the joint base to the school district says, I'm just telling you, our parents, they want this taken down. You're telling me there's a legal distinction between her saying our parents want this taken down and we, the federal defendants, want this taken down. There's an important distinction because Chief Duff and state and local law enforcement, they have their own independent discretion to decide how they want to handle the post, and the federal defendants never asked for this post to be removed. Do you think Chief Duff didn't understand that to be, hey, get this taken down? That's really your argument, that that email from the Lieutenant Colonel to the police chief didn't get understood by him as you get this thing taken down, which he managed to do within a day. That's your best? No, there is no evidence in the record at any point that the federal defendants asked for Chief Duff to take the course that he did. All the federal defendants did was contact Chief Duff and state law enforcement in New Jersey and say, hey, there's potentially an elevated security risk at a school that is attended by the children of military families. Just be on the lookout for potential threats. That is the full extent of the allegations of the federal defendant, and that's not enough to get a preliminary injunction. Okay. We got your argument. Thanks. We'll hear from counsel for Chief Duff. Good morning, Your Honors. May it please the Court. Walter Kowalik, Marshal Denny, on behalf of Chief Duff. I actually have to say at the outset he actually is no longer Chief Duff. He has retired from his position and still has a position with the school board. He's a public safety officer in one of the schools. He's no longer the chief of police. When we're talking about injunctive relief, we're talking about an injunctive relief, a threat of future injury, and a threat of future injury from the specific defendant. I think the record here shows that since the communication with Miss Duffer, that Chief Duff has done nothing more as opposed to her. Are you telling us that he's not in a position to do something? He's not. Well, that would be meaningful if you said he's not in a position to do anything about this. He's retired. That would be one thing. But is he in a position to influence? I mean, conceivably, since he still is a public safety officer, there is whatever heft that position holds. But the question then becomes, is there a likelihood of future injury? And basically I don't see it. This was about a single post. Let's assume, let me ask you the same line of questions I asked your friend on the other side. Let's assume that when Chief Duff called Stouffer that he had committed some civil wrong in causing Stouffer to take down Redding's post. I understand your argument to be even accepting, I know you don't agree with it, you're only accepting it for purposes of my question. But assuming that that was a civil wrong, your argument is that after that, Duff has done nothing. Duff has done nothing. The only other thing that they point to is at a subsequent board meeting, which in response to her post there was indication that, you know, there might be trouble at this meeting, and that's in the record. He basically, he put in essentially the same kind of security he had in his building. You know, had people go through security before entering the board chamber to make sure that there wasn't any weapons and so forth. He made sure that there was plenty of police officers. Right. Your argument there is, I assume, is that even if he did something wrong in causing Redding's post to be taken down, in light of what third parties were commenting on the website, he did something correct by providing adequate security to the school board. Well, my position is this. Whether or not his initial contact with Ms. Duffer violates the First Amendment or is an actionable action is irrelevant for our purposes here. Because what we have to look at here is just about the injunction. Now, as the case law does say, it has some effect only to...  I'm sorry? We can look to what he did before for... I'm sorry. I'm hard of hearing. We can look to what he did before when he contacted Stauffer for predictive value, right? That's what Murphy says. Right. To the extent that it highlights the potential for future action. Right. So if Ms. Redding were to somehow persuade Stauffer to put that post up again and say, you know, they're still doing it in these schools. I have all the same concerns. Why wouldn't she reasonably expect the same sort of treatment? Well, number one, he's no longer the chief of police. That's the easy answer. The other answer is that there is no... in that case, there would be no ability for him to take it down. In other words, we have to understand here that this is a third party case. It's cat's paw. I mean, he didn't forcibly take down her post. He leaned on Stauffer to do it. And you've told us that he's now the public safety officer. So to Judge Porter's point, why couldn't he, as the public safety officer, pick up the phone or visit Stauffer and lean on her again to take it down if she were to put it up? Right. And this is where the third party part comes into play, because it says that you have to have evidence that the third party is going to act in that way. In this hypothetical, Ms. Stauffer is already going against that by reinstating it. So in that situation, there wouldn't be that demonstration that the third party would act in the same way as before. She's acting opposite in the hypothetical as she did in the past. In other words, she took it down before. She's putting it back up now. So there's no indication in that hypothetical that even a call from, you know, the school security officer would persuade her to take it down. That's, I think, you know, the other answer. Right. But if she asked, if Ms. Redding asked Ms. Stauffer to put it back up and she puts it back up and your client picks up the phone and calls Stauffer, then we're in an equity land. Then an injunction is required, right, if it's a civil wrong. Well, I think that you have to make a leap to go from he's calling her and she's acting, because it is that her acting, that's the key part. And they were talking about, they were focusing on. It's her acting under coercion. I mean, her affidavit says, quote, Duff intimidated me into doing so by telling me that the post and Ms. Redding were under investigation by Homeland Security because of the supposed potential for the post to cause a school shooting, like the one that had occurred in Valle de Oro, a mass shooting like the one that had occurred at a gay nightclub in Colorado. Duff told me that the threat posed by this innocuous post was such that he had to provide extra security. He was clearly and unequivocally pressuring me to censor the post while trying to pretend that he was not doing so. This sounds like a reasonably intelligent woman saying exactly what she understood was being communicated to her. In light of that, doesn't it ring a little bit hollow to say Stouffer just did it? She did it because she felt intimidated and threatened and coerced to do it by Chief Duff. At least that's her testimony, right? Well, two things. Number one, it's an unsworn statement. So to say it's her testimony I think goes a little bit far. But if we accept that this is what she's saying, if you look at what she's saying, number one, she does say he didn't ask me. Number two, when she says she felt intimidated, she didn't say he. She said I felt intimidated. In other words, in other words, it was like a spontaneous sense of intimidation. It had nothing to do with the guy on the other end of the phone being the police chief and saying, you're going to be responsible if there's a shooting in this school because you didn't take this down. It was just kind of bubbling up inside of her. Yes, if we are going to say that the chief of police, simply by the fact that he's the chief of police, if his status as chief of police causes someone to feel intimidated, that he has no First Amendment rights, we don't say that. Didn't he insinuate or state that she could be held personally liable? Stouffer could be held personally liable? He didn't say that. She said this is what she believed. If you read that, she said, this is what I believe. He said it's being investigated, which it was, truthful statement. And then she said, I felt intimidated because I feared this. Okay? She did not say that he threatened that. You know, we can go in and read her statement in full, but my recollection is, as Judge Hardiman's, that he strongly implied, even if he didn't explicitly say, you will be personally responsible if there's a problem. And this post hasn't been taken at. And I specifically read this portion yesterday because I was concerned about this exact point. Because she said, I felt and I feared this result. Not that he said that this result. The legal position is that that means it wasn't anything Duff did. It's just her. It's just her unnatural fear, her sort of sense of intimidation. But it wasn't anything he did. I think that she felt intimidated. But then again, that goes to the point of, if a police officer speaking to someone causes the other person to fear intimidation, does that limit the officer's First Amendment rights? He can call her and say, look, I'm the chief of police. This is my fear. Would you please take it down? She feels fear. Then what? He violated the First Amendment by asking? Like, that's not what the law says. The law provides that public officials have a First Amendment right. It sounds a lot like Voolo. It sounds a lot like, I know Voolo wasn't decided at the time the district court made its decision here, but this sounds a lot like what happened in Voolo. How is it different? Well, I think that the. You've got someone wielding government power who has an ideological goal in mind and acts to achieve that ideological goal by taking away somebody's First Amendment rights. That's what happened in Voolo, and that's what happened here. Because there was no threat involved. And that's the difference here. He called her and he spoke to her and convinced her. We've got the record when you say that's not what happened here. On the basis of the records here, you know, we can take a look and see whether or not Chief Duff was merely saying, boy, it'd sure be better if you took this down. Thanks. Or whether he was doing something to be coercive. But I take it your main argument is that's all for another day. Because today we're in a posture where nobody's done anything to this plaintiff. I'm sorry. I'm a little hard of hearing. I'm a little hard of hearing, too. I have more than just sympathy. I've got empathy. I understand your main argument to be really this is all an argument for another day because there's not enough there there. There isn't enough of a chill, ongoing chill there to make this a case appropriate for preliminary injunctive relief. Have I understood you right? Yeah. And the other thing that I think is important, well, two things. Number one, yeah, it's that distinction between this could be a first amendment violation. She could be entitled to recovery, but not an injunction. I mean, that's simply how it could shake out. And that's the way I think as far as the injunction goes that that's what we have here because of the lack of threat of future injury. But the other thing is that I think it's important that Judge Williams' findings that, you know, her speech wasn't chilled. She continued to discuss this case. She went on the John D'Ordano show. She had her own website where she discussed all these issues. So the question of being, you know, if she wasn't chilled in that time period, then what moving forward demonstrates a potential for future injury? We got you. Thanks. Thank you, Your Honors. I appreciate your argument. We'll go ahead now and hear from counsel for Helen Payne. Good morning, Your Honors. Good morning. Michael Madden from Madden & Madden on behalf of the superintendent of the North Hanover School District, Helen Payne. Following up on what counsel stated and with respect to what Judge Williams stated in her opinion, as to Defendant Payne, all she did was issue a single letter to the community on December 1, 2022, in response to what has been discussed today. It wasn't just with response to Angela Redding's Facebook post, but it was in response to all of the social media chatter that flowed from it. And Defendant Payne received emails and information from the federal defendants and reached out, obviously, to Chief Duff as the chief of security in the school district and moved forward with respect to ensuring that her students and the families that were calling and raising concerns about what they were seeing on social media were addressed within the school. And I think with respect to why we're here today, there's no indication at all that Superintendent Helen Payne has taken any action since December 1, 2022, when she issued that community update. Was she actively involved in the communications with Chief Duff? She was. When you say all she did was post this one public thing. She was involved with communications with Chief Duff, of course, Your Honor. I mean, she was concerned about what was going on when she was being contacted by parents and what she was seeing on social media and what was being forwarded to her from other people. She was part of this conduit, was she not, Mr. Madden? Like, you've got Major Schilling raising an alarm. He goes, among others, to Lieutenant Colonel Hall. Lieutenant Colonel Hall communicates as the liaison with the school district to Superintendent Payne and says the parents want this post taken down and Superintendent Payne is in touch with Chief Duff. Is that the way the route of communication goes? Well, I think there was also communications between the federal defendants and Chief Duff as well, and there were also communications. But she's in a line of communication with the Chief, right? Of course, of course. There's no dispute there. I mean, obviously, when a superintendent of a school district is handed these e-mails or receives these e-mails raising concerns about the safety of children in schools, what is she to do? Right. I understand your position, which is she had a responsibility and she carried it out.  Correct. And from the standpoint of future harm, I think I would reiterate, I don't want to continue to say what my colleagues have said, but with respect to Helen Payne, there has been – it's actually – Helen Payne has not made any statements, made any e-mails, or made any comments related to Angela Redding other than – I don't even think the letter to the community goes so far as to even address Angela Redding's post. I think the letter to the community was more in response to the number of parents that contacted the school district and said, we have real concerns about what's going on. And her letter to the community was only that. It was a letter related to simply – these are – we understand your concerns. Your safety of – the safety of your children is our number one concern. And that's it. Understood. Thank you, Mr. Madden. Thank you very much. Okay. We'll hear from Mr. Farrar on rebuttal. Thank you, Your Honor. I guess I'll begin with Ms. Payne. She was deeply involved in the censorship of operation. Two days before the censorship, she suggested to Chief Duff the rationale that this would provoke a nightclub shooting like the one in Colorado. She conferred with him about the censorship and was surprised to find out that Angela Redding had found out about it. In the text messages we sued to produce – Speaking of the text messages, do you know whose text messages are being exchanged with Chief Duff in the – hey, it's baffling that this woman's on the school board? Yes. Who's that? Chief Duff is the one who says, it boggles my mind that someone with these views could be on the board. Payne – Who's on that text exchange with her? Payne. It's Duff and Payne. That's Payne. And Duff says she's sick in the head for defending herself in the media, to which Payne replies, old news. And again, she suggested the rationale for the censorship. She was in on the censorship before it happened and was surprised that Angela Redding had found out about the censorship that she knew was coming. I guess she didn't realize that the Facebook administrator would contact Duff and Angela Redding alike, to which Duff replied when Angela said she was speaking to her attorney about this, LOL. He thought it was a big joke. Now, in terms of Angela Redding continuing to discuss the case, she's defending herself. I would point to the twin media matters cases out of the D.C. District Court involving the two investigations by different attorneys general of media matters, and in those cases we have the proposition that defending yourself against the censorship attack does not vitiate a chill claim. So that's why we believe we're entitled to injunction. Let me ask you this. If we were to decide that Judge Wilson got it right, that there's not a threat of irreparable injury at this point in time, or if we thought Judge Wilson got it wrong because there was actually no standing and therefore no preliminary injunction, is your client left without a claim? Without standing, she'd be left without a claim. Well, without a claim for preliminary injunctive relief, right? Well, there's a money damage claim, but we're dealing with harm that is irreparable. There's multiple claims for compensatory damages, right? There could be at the end of the process, sure, and potentially also a claim for final injunctive relief on the merits. But the problem we have here is one of ongoing harm. And, you know, in terms of the chill claim, I take the defendants at their word. When they say they acted for reasons of public safety, when they say they had the right to speak, they call this government speech. When these defendants say they had the right and the duty to do what they did, why wouldn't they do it again? And now we know that the airport, she's lost her trusted traveler status. Well, can't we separate two things? Isn't it possible that coercing Stouffer to take down the post was a civil wrong and Payne, Duff, and others responding to comments on social media, not made by your client, comments made by third parties that their efforts to provide a safe environment at the school board meeting was perfectly appropriate? Can't those two things be true at the same time, that all of the actions in response to third parties was for the safety and security of the community and the children, and at the same time coercing the removal of the post was a civil wrong? Can't both of those coexist? I don't think so because the censorship is intimately connected with Schilling's statement that Mrs. Redding needs to be stopped and that her dangerous and divisive actions going forward must cease. It wasn't enough for these defendants that the post had been censored. You're quoting somebody there. Who are you quoting?  That's what I thought. Yeah. And Schilling said – You quote Major Schilling. Does Major Schilling's comments, does that touch, infect, color every other defendant in this case, that that suddenly becomes Superintendent Payne's comment, that that becomes Chief Duff's comment, that that's now Lieutenant Colonel Hall's statement? Schilling says something. It covers them all. That's your argument. No, that's not my argument. That's one statement. Then speak to Judge Hardiman's point, which is, isn't it possible that there could be a civil wrong here, indeed an actionable wrong associated with coercing public speech to be removed from the public sphere, and that you could have a number of actors acting within the sphere of their responsibility in a responsible manner? Well, no, because there are other statements to that effect, where the other defendant's indicating a retaliatory animus, and as this Court indicated in the Mitchell decision, I believe, the motive of a government actor in doing something that might otherwise be constitutional is not only relevant, but could be dispositive. So, for example, we have Defendant Vasquez. You don't have to give us any more examples. Yeah. Vasquez – I should mention that Vasquez says, this gets under my skin. Yeah. For sure. And he's the one that reported it to the various security agencies. Also, we heard – We'll give you – I'll give you 30 seconds to wrap up. Sure. I'll give you an extended period of time on it. Sure. 30 seconds is fine. So, Defendant Lesher most certainly did ask Defendant Duff to censor the post. He pushed it to him twice. There's an email saying, per our discussion, the censorship happened thereafter, and neither Lesher nor Duff contested that account by filing declarations saying, no, Lesher did not ask me to censor. It's established in the record. All right. Well, we thank all the counsel for argument. It's an important case. We've got it under advisement, and we'll go ahead and hear our next case.